## BETTES v. MID-TEXAS PETROLEUM CO. (No. 1349.)

(Court of Civil Appeals of Texas. El Paso. June 1, 1922. Rehearing Denied June 28, 1922.)

**1. Mines and minerals ⚌78(1)—Time for completion of work under lease and drilling contract held to run from date of actual execution.**

The time for completion of the work under an oil lease and well-drilling contract, dated February 4, but not actually executed until February 19, *held* to run from the latter date.

**2. Mines and minerals ⚌78(7)—Time for completion of rigs for oil wells and waiver of completion within time held for jury.**

Time for completion of rigs for two oil wells and waiver of completion within such time *held* for the jury.

**3. Mines and minerals ⚌78(2)—Short delay in lessee's completion of rigs for oil wells held not to work forfeiture under contract.**

A short delay in lessee's completion of rigs for oil wells will not work a forfeiture, though the contract states that time is of the essence thereof, where lessor by his acts and declarations has led lessee to believe that a forfeiture will not be enforced because of such delay.

**4. Mines and minerals ⚌78(7)—Failure to submit issue as to return of Liberty Bond deposited as guaranty for performance of lease and oil drilling contract held erroneous.**

In a suit to forfeit an oil lease and drilling contract, together with a Liberty Bond posted as a guaranty of performance, for failure to perform within the time required, where defendant alleged and he and his agent, who negotiated the contract, testified that the bond was to be returned to him when the rig for the second well was completed, the court erred in failing to submit the issue as to the return thereof after the completion of such rig.

Appeal from District Court, Stephens County; W. R. Ely, Judge.

Suit by the Mid-Texas Petroleum Company against J. W. Bettes, in which McCleary Bros. and others were made parties defendant, and parties not impleaded intervened. From a judgment for plaintiff, defendants McCleary, and certain interveners, defendant Bettes appeals. Reversed and remanded.

B. B. Chappell, of Breckenridge, J. R. Stubblefield, of Eastland, and McLean, Scott & McLean, of Fort Worth, for appellant.

Jno. W. Woods, of Abilene, Goggans, Bateman & Leaverton, of Breckenridge and W. C. Jackson, of Abilene, for appellee.

WALTHALL, J. The Mid-Texas Petroleum Company, of Fort Worth, Texas (a trust estate), brought this suit against J. W. Bettes to cancel and forfeit an oil well drilling contract and lease on 40 acres of land in Ste-phens county, and to remove cloud from title, and to forfeit to the said company $1,000 posted with the company by Bettes as a guaranty for a performance, on his part, of the provisions of the contract, and for the appointment of a receiver to take charge of the lease and equipment and operate same under order of the court, alleging that Bettes had failed to comply with the terms of the lease and drilling contract.

After reciting that the Mid-Texas Petroleum Company is the owner of the oil and gas lease to the 40 acres, describing it, and its desire to develop same for oil or gas, the lease and drilling contract recites that the company, in consideration that Bettes agrees and binds himself, his heirs and assigns, to pay to the company three-eighths of all oil and gas produced from the 40 acres of land, and delivered as stated, the company grants, sells, conveys, and assigns to Bettes the leasehold interest in and to said property upon the conditions following: Bettes agrees to drill four wells upon the 40 acres upon the following conditions:

The rig for well No. 1 to be erected within 20 days from the date of the contract, the well to be spudded in within 40 days from the date of the contract. The rig for well No. 2 to be erected within 40 days from the date of the contract, and the well spudded in within 60 days from the date of the contract, provided, if Bettes at the end of 60 days has not progressed in drilling well No. 1 sufficiently to pull his heavy casing to be used in spudding in well No. 2. Either or both of wells Nos. 1 and 2 may be offset wells to wells drilled or to begin drilling on adjacent property. Should there be additional offset wells to this track other than the two offset wells mentioned, then Bettes shall immediately begin and drill offset well or wells thereto. Then follow certain provisions as to wells 3 and 4 which we need not state. The contract then provides that when each of said wells shall have been spudded in drilling thereof shall be diligently prosecuted until said wells are completed to the oil-bearing sand, known as the sand in the Lyddon pool, unless oil shall be found in paying quantities at a lesser depth.

It is further agreed that Bettes shall use all modern means and equipment in drilling and completing each of said wells so as to make the paying oil sand encountered produce the maximum production of oil. It is agreed that Bettes shall provide at his own expense and cost all necessary storage to care for all oil produced, and other provisions as to separators, pumps, power plants, etc., not necessary to here state. It is agreed that time and efficiency are essence of the contract. It is agreed that as a guaranty for carrying out the full provisions of the contract Bettes has deposited with the company

⚌For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

243 S.W.—48

$1,000, which shall be forfeited to the company on failure of Bettes to fully comply with the terms of the contract, and that in addition to the forfeiture of the $1,000 as above, failure to fully carry out the contract in its entirety shall work a forfeiture to the company of the contract and the leasehold interest conveyed with the equipment thereon. It is agreed that the things to be done are contingent upon strikes, damage by floods, fire, or storm, and that reasonable extension shall be agreed upon to offset any such contingency.

The contract is dated the 4th day of February, 1921, and signed by both parties. The company alleged a performance on its part, and that Bettes had wholly failed to carry out the provisions of the contract, or any part thereof, and that by reason of said breach of the contract by Bettes in its entirety he has forfeited all rights thereunder, together with the $1,000 and all equipment placed on the leased premises; that Bettes caused the contract to be recorded in the office of the clerk of the county court, and by reason thereof same is a cloud upon the leasehold interest in said property.

It is alleged that Bettes failed and refused to spud in well No. 1 within the time provided in the contract; that he failed to erect the rig for well No. 2 as provided in the contract; that due notice was given Bettes of the forfeiture of the contract; that prior to and since said forfeiture of said contract divers persons with whom Bettes had contracted for drilling said wells, and for furnishing casing and tankage and digging slush pits, have gone in upon said premises and performed work and furnished material, and Bettes has failed and refused to pay for same; that the drillers on said wells and persons who agreed to and furnished a portion of the casing and tankage had contracted with Bettes to accept as consideration for their services and material an interest in the production from said wells, and said persons are interested to said extent in said lease. The company alleged the existence of other wells in close proximity to said land which drain the oil therefrom and materially damage said lease; that one of the Bettes wells had been drilled to a depth of about 800 feet, and that for the past 15 or 20 days has been shut down by reason of Bettes not complying with his contract with the drillers to furnish casing and other equipment.

The company prayed for a cancellation and forfeiture of the lease and drilling contract, a removal of the cloud from the leasehold interest, judgment for the equipment placed on the premises, the $1,000 deposited, and the appointment of a receiver with orders to operate the lease.

Bettes answered by general denial, and by cross-action to the effect that on or about February 4, 1921, the plaintiff company entered into the contract as set out in the petition; that thereafter, on or about the 18th day of February, 1921, the plaintiff company, acting by and through its president, John W. Wood, agreed with him that—

he (defendant) "should have an extension of 10 days in which to erect and spud in said well; that though the contract was dated February 4, 1921, the contract was not in truth and in fact executed until February 19, 1921, after the plaintiff had agreed with the defendant that he could have 10 days' extension as above mentioned, and upon the promise of the plaintiff to make a supplemental agreement or contract allowing such extension of 10 days to erect rigs and spud in said wells."

Defendant alleged that he relied upon the promise of defendant to extend the time as above; that instead of executing the supplemental contract as agreed, defendant pleads the following letter:

"February 19, 1921.

"Mr. J. W. Bettes, City—Dear Sir: Referring to contract made with you February 9th, for the development of the north 40 acres [describing same] beg to advise that you are hereby given an extension of ten days in which to have rig erected and completed on well No. 1 named in said contract. No other extension or variation of said contract is given other than an additional 10 days to the 20 days given for the erection of rig for Well No. 1. Very truly, Mid-Texas Petroleum Company, [Signed] By John W. Woods, President."

Defendant alleged that he caused to be erected and completed rig No. 1 on or about March 14, 1921, and completed rig No. 2 on or about March 20, 1921; that he spudded in well No. 1 on or about March 19, 1921. Defendant further alleged that the plaintiff through its conduct and misrepresentations caused defendant's contractors and workmen to remove tools and boiler from well No. 2, and that but for same well No. 2 would have been spudded in about same time No. 1 was spudded in, and prior to the date he was required to spud in No. 2, under the contract. Defendant alleges that on or about March 18, 1921, his agent, Mrs. Talmadge, was led to believe by John W. Woods, plaintiff's president, that it would be all right and agreeable for the work to be done, and there would be no forfeiture, and that, acting upon said representations, defendant, on or about March 19, 1921, commenced the drilling of well No. 1, and drilled same to the depth of 860 feet; that, relying upon the representations of plaintiff, he executed certain contracts with parties, naming them, and setting out the contracts, to do the work of erecting the derricks, furnish material, and do the drilling as required by the contract, and stating what was done and furnished under said contracts, and that the parties were willing, ready, and able to do the drilling, until hindered by plaintiff, as pleaded. Defendant alleged that plaintiff permitted the drilling of

well No. 1 as above, though plaintiff knew that well No. 1 was not spudded in within the time mentioned in the original contract and in the extension mentioned.

Defendant Bettes pleaded that by reason of the extension of the time of erecting rig No. 1 and spudding in wells Nos. 1 and 2, and by reason of plaintiff's acquiescence in permitting defendant to spud in well No. 1 and the drilling of well No. 1, as alleged, plaintiff is estopped from canceling this contract.

Defendant alleged the value of his contract, and that by the acts of plaintiff in declaring the contract forfeited, and in causing the contractors and workmen to abandon the work, and in removing the appliances from the premises, and in instituting this suit, the market value of his leasehold rights have been wholly destroyed, defendant's credit and reputation so diminished that his marketable interests in said property has become worthless, to his damage, $300,000, for which he sues; that he sustained damage in the further sum of the $1,000 deposited with plaintiff, which he alleges to have been a Liberty Bond. Defendant asked that the contractors mentioned, namely, McCleary Bros., L. C. Mann, and E. P. Chadsey, and the Texas Eagle Oil & Refining Company, be made parties; that their rights might be adjudicated; that he have judgment for his said damages; and in the alternative, that he have judgment for the value of the well rigs, material, equipment placed on the lease, and the value of drilling the well to the depth of 800 feet.

Plaintiff and defendant filed supplemental pleadings and trial amendments.

The additional parties made defendants filed answers, and parties not impleaded intervened and asserted prior liens, and answers thereto were made, but we think we need not further state the pleadings.

The case was tried with a jury, and after the evidence was heard the court instructed the jury to find for the plaintiff as against the defendant, Bettes, and in favor of the interveners McCleary against defendant, Bettes, and for a foreclosure of their lien against the two oil rigs situated on the premises, and in favor of intervener Noble against Bettes for the amount of his debt. The court entered judgment, sustaining certain exceptions and overruling others; approved the verdict as rendered, canceled the lease contract pleaded by plaintiff; removed the cloud from title as against Bettes and interveners; vested the title to the Liberty Bond in plaintiff; rendered judgment in favor of certain interveners named, and against Bettes as indicated in the verdict, and for amounts stated and ordered foreclosed their several liens; the court appointed a receiver as prayed for. Bettes prosecutes this appeal.

Appellant submits four propositions, all claiming error in the giving of the peremptory charge to find for the appellee and against the appellant.

Under the first proposition it is claimed that the issue of estoppel should have been submitted to the jury.

Under the second proposition it is asserted that the evidence was sufficient to show that appellee assented to the delay in completing the derricks and spudding in the wells, and raised the issue of fact as to whether appellee waived a compliance with the contract as to time stated in the contract, and acquiesced in such delay. The third proposition claims that the evidence was such as to show performance of the conditions of the contract on the part of appellant, and it was an issue of fact for the jury as to whether appellant performed the contract. The date of the lease and drilling contract between appellant and appellee is February 4, 1921. By its terms the rig for well No. 1 was to be erected within 20 days from that date, and the well be spudded in within 40 days from the contract date.

On February 19, 1921, by a letter of that date, John W. Woods, president of appellee, extended the time 10 days in which to have rig erected and completed on well No. 1. As to the above dates there is no controversy in the evidence. While the contract was drawn up and bears the date of February 4th, Mr. Woods testifies that it was not acknowledged until the 19th of February, and the acknowledgment bears out that statement. The acknowledgment was as to both Woods and Bettes. Woods, in testifying as to the date of the acknowledgment, said:

"Mr. Bettes took the contract and left that night, and when he came back later begged for time."

It was then the 10 days' extension was granted. The confusion arises as to when the 20 days for the erection of the rig on well No. 1 commenced. If it commenced on the 4th of February, the 20 days and the 10 days would require the completion of the rig on well No. 1 by the 7th of March, but if the 20 days commenced on the 19th of February, the rig on well No. 1 was to be completed on the 21st of March. Mr. Woods declared the contract forfeited and canceled on the 17th day of March. The witness McCleary, with whom Bettes contracted to erect the rigs for the wells, testified:

"Rig No. 1 was completed March 21, 1921. My men completed the rigs. I was out there. No. 2 was completed on March 21st."

Mr. Mann, one of the parties Bettes contracted with to dig the wells, testified:

"I spudded in a well on this 40 acres. We spudded in on the 19th day of March. We drilled that well 845 feet. * * * I think I first knew that Mr. Woods was trying to forfeit the contract with Mr. Bettes, or was claiming that it was forfeited, was about the [after a correction on the date] 5th day of

April. He did not tell me before that at any time that the lease was forfeited. I was in Judge Woods' office a few times, but I don't think that that subject was mentioned. He knew that I was drilling well No. 1 on the 40-acre lease at that time. * * * At the time I made this contract with Mr. Bettes I was willing, ready, and able to drill the four wells under the terms of my contract. I was ready, able, and willing to carry out my contract with Mr. Bettes."

Witness Chadsey testified:

"Mr. Mann and I made a drilling contract with Mr. Bettes. Mr. Mann and I started one well on this particular tract of 40 acres. We started one well. That well was spudded in on the 19th day of March."

Witness Mrs. M. E. Talmadge testified:

"I was authorized to make a contract with Mann and Chadsey. I made that contract with them. Mr. Bettes authorized me to make this contract. I know something of Mr. Bettes' financial condition at the time he made this contract. * * * I know that he was able, ready, and willing to carry out the terms of the contract when and after he made the contract, and at the time he made the contract. * * * I asked him [Mr. Woods] for the written extension [of the contract] that he was to give, and he said he had mailed it to Mr. Bettes. He told me what the supplemental contract contained; then read it to me. That was after I had made this contract. That extension of 10 days did not include 10 days'. extension of the full terms of the contract. * * * When it finally was written it only gave the extension just to build one rig and not to spud in, and not to build the other rig; but of course it would automatically extend the spudding in because you could not spud in until you had a rig built. * * * Rig No. 1 was completed about the 14th of March. I have been on the lease. I was on the lease on the 20th, and they told me they spudded in the day before and were down then about 80 feet. That would have been on the 19th that they spudded in. I was out there the day they were finishing rig No. 2. I do not remember the date. That was a short while after well No. 1 was spudded in. I am looking after the interest of Mr. Bettes. * * * Part of the casing was furnished in time to spud in. Mr. Bettes here furnished part of it. He did that when the contract was made. Against his instructions, on March 17th, I paid one bill. I paid $700. The other bills presented to me I did not pay. The reason I did not pay them was because the people stopped moving casing, because I would not pay the bills after I received notice of the forfeiture of the lease. I received that on the 17th of March by wire. * * * Mr. Woods told me after that to go ahead with the work on that well. He told me we could go ahead with the work on that well. I took the train and came right over here and saw him that day or the next. * * * That was after the 17th. I think it was on the 19th that he told me we could go ahead with the work."

Defendant Bettes testified:

"I made a lease with Mr. Woods on 40 acres in the Lyddon pool. I made that contract which you hand me. I am ready, able, and willing to carry out the terms of this contract. I made 'this separate contract with Mr. Woods. I believe it was entered into on or about the 19th of February. I made that contract after the first contract was made on or about February 4th. I made that contract in order to get Mr. Woods to give me a 10 days' extension or more. He agreed to give me the 10 days' extension. I did not receive a 10 days' extension on the contract. I received a copy of the original contract on the evening of the 4th of February, 1921. That was when we signed the original contract. I was furnished a copy at that time. Judge Woods had sent the original to Fort Worth to have it signed, or verified by the secretary and treasurer, and then he was to have the original sent back to him and then he was to deliver the original to Mrs. Talmadge, and I was to return my copy of the contract and have that verified by the secretary of the Mid-Texas Petroleum Company, and for that reason I never received the original contract from Mr. Woods until about the 19th, when he requested me to sign this supplemental contract. When this supplemental was signed by me I noticed that the 10 days' extension was not in it. I said something about it to Mr. Woods. I told him that the extension he was to give me under the original contract was not in this supplemental. * * * Mr. Woods never did request me not to go ahead with the work out there. He agreed that we could go ahead with it after March 17th."

In answer to questions as to why certain delays were had, and certain material, including machinery, was not paid for, both Mrs. Talmadge and Bettes said that was on account of the notice from Mr. Woods that the contract was canceled. Mr. Woods testified:

"Rig No. 1 was practically completed when I was there on the 16th and 17th, but as to the exact date I do not know. I know rig No. 2 was not complete on the 17th, and had been barely started. * * * I think I said yesterday that I was on the ground about the 6th or 7th of March, and I was there again somewhere about the 12th or 13th. * * * The forfeiture was not due until about the 15th. They had not spudded in at No. 1, and No. 2 was not complete at the time I saw him (Bettes). I said nothing about canceling the contract, as that was in the neighborhood. I did not have any intention of declaring it forfeited. I would not permit him to go ahead and finish the rig No. 1; that is, erect the rig No. 1, and spud in after I had already declared the contract forfeited. I did not permit him to go ahead and finish rig No. 1 and spud in after I had declared the contract forfeited. He spudded in some time after I declared it forfeited. I had declared the contract forfeited before he spudded in. I think the rig was erected about the 6th of March (evidently meaning the 16th). I did not do anything until after the 17th toward a forfeiture. Mrs. Talmadge came to see me about this proposition. I will tell what was said. I told her absolutely that the contract was forfeited, and that I would insist on it. The last words I told her before she was in my office was that

the contract had been forfeited. That conversation was after the 17th of March. I think I had a conversation with her after that relative to the supplemental contract. * * * I told her as well as I remember that I would like for Mr. Bettes, and I told him the same thing, for him to sign this supplemental contract, which would be an amplification of the original contract signed on the 4th; just as to the offset wells, and that he might reconvey the 20 acres in the event of only two wells."

Mrs. Talmadge, recalled, testified:

"Mr. Woods did not ever say anything to me about forfeiting the lease any time before the 17th of March. There was not a word said. We had no talk about it."

It was explained in the evidence that a derrick and rig was necessary in order to spud in, and that by spudding in was meant "they hook the bit and start the hole."

[1-3] It seems clear to us that the contract was not subject to cancellation and forfeiture on the 17th day of March, 1921, and that the parties to the contract did not so understand it. To consider that the 20 days named in the contract of February 4th within which the rig for well No. 1 should be erected should begin on the 5th day of February, and to that time add the 10 days' extension, the rig for No. 1 should be complete on March 7th. But Mr. Woods himself said "the forfeiture was not due until about the 15th." To count the time when the 20 days should begin to run as beginning on the 20th day of February, and then adding the 10 days' extension, rig No. 1, under the contract, must then be complete on the 21st of March. From some of the evidence introduced it appears that rig No. 1, if not fully complete on the 16th of March, was completed, the well spudded in, and down about 80 feet on the 19th of March. The evidence shows that rig No. 2 was erected within the time required under the contract, if the time is reckoned from the 19th of February, when the parties acknowledged the contract, and from which time, from all the facts and circumstances in evidence, we think appellant could fairly reckon the time to begin. But aside from what has been said as to the construction of the contract itself as to when the two rigs should have been erected, we think the evidence is such as to require that the time within which the two rigs should have been completed should have been submitted to the jury. While Mr. Woods denied that he had made any statements to Mrs. Talmadge or Bettes by which either could be led to believe that the work could continue and without a forfeiture in the erection of the two rigs after the time when they should have been completed under his construction of the contract, the evidence, we think, is sufficient to require that the waiver of the time for the completion of the rigs should have been submitted to the jury. While the contract states that time is essence of the contract, parties by their acts, conduct, or representations may waive the time. A delay for a short time will not work a forfeiture where a lessor by his acts and declarations has led the lessee into the belief that a forfeiture, because of such delay, would not be enforced. Thornton on The Law Relating to Oil and Gas, § 159, p. 238, and cases cited.

[4] Both Mrs. Talmadge and Bettes testified unequivocally that the $1,000 Liberty Bond deposited as a guaranty for the performance of the contract was to be returned to Bettes when rig No. 2 was completed. Rig No. 2 was completed. In our judgment there could be no doubt but that the issue of the return of the bond should have been submitted to the jury. The issue is made both in the pleading and in the evidence. The issue was not submitted, and the judgment forfeited the bond to appellee.

For reasons stated, the case is reversed and remanded.